James W. KEGLEY, Appellant,

v.

DISTRICT OF COLUMBIA, et al., Appellees.

No. 80–199.

District of Columbia Court of Appeals.

Submitted Nov. 4, 1981.

Decided Feb. 16, 1982.

Charles H. Schulze and Leonard C. Pederson, Jr., Washington, D. C., were on brief for appellant.

Judith W. Rogers, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Philip T. VanZile III, Asst. Corp. Counsel, Washington, D. C., were on brief for appellees.

Before KELLY, FERREN and PRYOR, Associate Judges.

KELLY, Associate Judge:

The allegations in this appeal of a review by the Superior Court of a Metropolitan Police Department Police Trial Board (Trial Board) decision dismissing appellant from the police force are that (1) the trial court erred in sustaining the Trial Board's finding that appellant impermissibly left his police service revolver in an automobile; (2) appellant was denied equal protection of the laws because he received an unusual sanction, dismissal; and (3) appellant was denied due process of law when the trial court substituted its discretion for that of the Trial Board. We reverse, holding that an incorrect standard of review of the Trial Board's decision was applied, and that there was substantial evidence on the record to support each of the Trial Board's findings.

I

Appellant James W. Kegley was appointed to the Metropolitan Police Department (MPD) on January 3, 1972. Before joining the force, appellant was given a thorough medical examination. At the time, he told the examining physician that in 1962, in a football accident, he had sustained an injury to his left knee which had required surgery. The examining physician requested a written medical report of the knee opera

tion. The report submitted by appellant showed that he had recovered sufficiently from the knee injury to enable him to pass the required departmental physical examination and be admitted to duty.

On May 1, 1974, while performing his police duties, appellant jumped from a ledge and reinjured his left knee. He went to the Police and Fire Clinic for treatment and was treated for a sprain, an injury which normally heals quickly. This injury, which aggravated appellant's earlier knee problem, required another knee operation in June of 1974.

Appellant was soon able to return to work on "light duty" status. In April of 1975, he returned to full duty status as an officer; however, on November 10, 1975, he was unable to continue working because of a flare-up of his knee condition which caused the knee to lock and swell. On November 25, appellant was placed on chargeable sick leave; and upon exhaustion of his accrued sick leave, he was placed on leave without pay. He thus had no source of income from the MPD.

Appellant returned to the Police and Fire Clinic to have his knee reexamined on January 9, 1976 and again on February 6, 1976, when he requested retirement for disability from the MPD. According to normal procedure, appellant was referred to a specialist and thereafter considered for retirement. His orthopedic surgeon, Dr. Stanley Lavine, found that appellant had a permanent partial disability. He recommended that appellant not be returned to full, active duty; but he did believe that appellant could perform light duty.

While waiting to be retired for disability, appellant, on April 6, 1976, began work for the William F. Klingensmith Company (Klingensmith).[1] His job, listed on the company payroll records as "laborer," required

him to lift cinderblocks and bricks, mix mortar, load mortar into wheelbarrows, roll the wheelbarrows full of mortar up an incline to an elevator, put the load onto the elevator and send it up the elevator. The MPD did not know that appellant was working for Klingensmith. Appellant admitted subsequently that he failed to request permission for such employment, in violation of an MPD directive, MPD General Order Series 201, Number 17, Part I–C–1, because he knew that such a request would be denied.[2]

During the time that the appellant worked for Klingensmith, the Board of Police and Fire Surgeons was processing his request for retirement. On July 14, 1976, it issued a report to the Police and Firemen's Retirement and Relief Board (Retirement Board), which stated that it was unable to find appellant permanently disabled for further police duty and so could make no specific recommendation concerning whether he should be retired from the MPD by reason of his physical impairment.

Meanwhile, in early April 1976, the MPD's Internal Affairs Division was alerted to the fact that appellant was working for Klingensmith and was living at an address other than his address of record.[3] Several investigators looked into the allegations. They made observations of appellant's activities on April 19, 20, 23, 30 and May 3, 18 and 26, 1976. The investigation revealed that appellant was not living at his address of record in Hyattsville, Maryland, but instead, was living with his sister in Lanham, Maryland. Appellant later admitted that at that time he had been living with his sister for five to six months because he and his wife had separated, but he maintained that he frequently went to his old address. The investigation also confirmed that appellant was employed as a

---

1. Before working for Klingensmith, appellant had been employed by Penn-Tech Corporation. He had not sought permission from the MPD to engage in outside employment.

2. It is a violation of MPD General Order Series 1001, Number 1, Part I–E–2 for a member of the police force on sick leave to engage in any

employment other than that of the police department.

3. Members of the MPD are required to report changes of address within 24 hours. MPD General Order Series 201, Number 2, Part I–A–2.

laborer by Klingensmith. The investigators made videotapes of appellant's activities at work which showed appellant engaged in manual labor.

On the morning of May 20, 1976, appellant responded to a request by an administrative officer, Marguerite Anastasi, to report to the Police and Fire Clinic to supply medical information needed to process his retirement request. When he appeared, Ms. Anastasi asked him whether he was still disabled and appellant replied that he thought so. To obtain information for a superior officer, she also asked appellant whether he had worked between November 10, 1975 and the present date. Appellant responded that he had not worked.

At this time, appellant was informed that he had been the subject of an investigation. Officers from the Internal Affairs Division then interviewed appellant, questioning him about his employment and change of address. Another interview was held on May 27, 1976. Appellant told the officers that he was employed as an elevator operator because it didn't "require any work on his knee" and that he had failed to report his address change.

At the conclusion of the second interview, appellant's police powers were revoked, and he was asked for his police service revolver. Appellant did not have the revolver on his person. He first stated that the weapon was at his sister's house but then remembered that he had left it in the trunk of his cousin's automobile.[4]

At this time appellant terminated his employment with Klingensmith, stating later that he did so because he "didn't want to ... jeopardize [his] retirement situation."

On August 26, 1976, the Retirement Board held a hearing on appellant's request for retirement for disability. After receiving documentary and testimonial evidence, the Retirement Board found that the serious condition of appellant's knee "was basically the same condition that it was on the date of his appointment" (and thus not service-related); that his claims of disability were called into question by the results of the investigation conducted by the Internal Affairs Division; and that appellant himself had expressed a strong desire at the hearing to work rather than to retire. As a result, the Board denied appellant's request for retirement, concluding that he was "not permanently disabled for useful and efficient service in the grade or position last occupied by him as a member of the Metropolitan Police Department of the District of Columbia."

Subsequently, appellant was charged with violations of six MPD regulations: malingering, engaging in outside employment, failing to submit a form requesting outside employment, willfully and knowingly making an untruthful statement pertaining to his official duties, leaving his service revolver in an automobile and failing to report his change of address.[5] He was brought before the Trial Board on November 2, 1976. After a lengthy hearing, the Trial Board found all six charges were proved and recommended appellant's dismissal.

The decision of the Trial Board was appealed to the Mayor, but the appeal was denied on December 29, 1977. Appellant's termination from duty became effective on January 28, 1978.

On June 23, 1978, appellant filed suit in the Superior Court against the District of Columbia, challenging the Trial Board's decision.[6] The District of Columbia moved to dismiss the complaint, or in the alternative, for summary judgment. The court heard the case on January 7, 1980.

---

4. Police officers are strictly prohibited from leaving their weapons in their automobiles. MPD General Order Series 901, Number 1, Part I–G.

5. The specific charges and specifications are set forth in the Appendix.

6. This action was consolidated with another action in which appellant alleged that administrative orders of the MPD, first placing him on chargeable sick leave and then on leave without pay status deprived him of due process of law. In that case, the court found for appellant and reversed and remanded the decision.

At this hearing, the court took evidence in addition to that which had previously been presented to the Trial Board and, at the close of the evidence, expressed doubt about the malingering charge because, in its view, appellant was enthusiastic about working as a police officer but the police medical personnel "would not certify that he could do police work." It also felt that appellant's failure to seek permission to undertake outside employment might be justified in light of his belief that such a request would be denied. The court said, however, that appellant may have violated regulations with respect to his service revolver and change of address. The court noted that at the time of the hearing it had not reviewed the entire administrative record and therefore would take the case under advisement.

On February 8, 1980, the court issued its decision:

> The court dismisses the [appellant's] case, finding that the Trial Board's order was supported by the evidence in that the [appellant] violated a police regulation regarding his weapon.

It also found that there was not substantial evidence on the record to support the other five charges. This appeal followed.

## II

A disciplinary proceeding before the Trial Board involves the tenure of an employee of the District of Columbia. *Matala v. Washington*, D.C.App., 276 A.2d 126, 128 (1971). Under the District of Columbia Administrative Procedure Act (DCAPA), D.C.Code 1981, § 1–1501 *et seq.*, any matter involving "the selection or tenure of an officer or employee of the District" is specifically excluded from the definition of the term "contested case," D.C.Code 1981, § 1–1502(8)(B) and therefore is not directly reviewable by this court. *Id.* at 127. Thus, review of a Trial Board decision is properly in the Superior Court. *See Money v. Cullinane*, D.C.App., 392 A.2d 998, 1000 n.2 (1978). The scope of that review, however, has never been explicitly articulated by this court. *See id.* at 1000, 1003 (Nebeker, J.,

concurring) ("[P]rocedures similar to those established by the DCAPA, which conform to the traditional forms of fair procedure are required"). Thus we now hold that the scope of review in the Superior Court of a decision made by the Trial Board is the same as this court's scope of review of a contested case under the DCAPA.

Our scope of review of contested cases, as stated in D.C.Code 1981, § 1–1510, prohibits the substitution of our judgment for that of the agency. *Jones v. Police and Firemen's Retirement and Relief Board*, D.C.App., 375 A.2d 1 (1977). It is established under the DCAPA that agency findings of fact and conclusions of law must be affirmed if "supported by and in accordance with reliable, probative and substantive evidence" in the record as a whole. *Id.* at 5 (and cases cited therein). *See* D.C.Code 1981, § 1–1510.

> [O]n judicial review, it is not the province of the court to substitute its judgment for that of the administrative agency, provided "the grounds upon which the agency acted [were] clearly disclosed and adequately sustained." [*Clark's Liquors, Inc. v. Alcoholic Beverage Control Board*, D.C.App., 274 A.2d 414, 418 (1971), quoting in part from *Securities and Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 94 [63 S.Ct. 454, 462, 87 L.Ed. 626] (1943) (*Chenery I*).]

The Superior Court must also apply this "substantial evidence" standard in reviewing the decisions of the Trial Board. It must review the administrative record alone and not duplicate agency proceedings or hear additional evidence. The trial court's function is to determine if the requirements of procedural due process are met, and whether the decision of the Trial Board is supported by substantial evidence on the whole record. *See* D.C.Code 1981, § 1–1510. Such a standard of review adequately provides for review of agency actions in cases which do not fall within the definition of a "contested case," *see Money v. Cullinane, supra* at 1000 (Nebeker, J.,

concurring), while avoiding needless duplication of the agency proceedings.[7]

In the instant case, the trial court, uncertain of its role as a reviewing court, did not apply a standard of review similar to that embodied in the DCAPA.[8] Appellant essentially received a trial *de novo* at the January 7 hearing. The trial court heard additional evidence in the case and did not confine itself to reviewing the evidence in the administrative record. Moreover, based on its perception of appellant's credibility after listening to his testimony at the hearing, the court plainly substituted its judgment for that of the Trial Board when it reversed the Trial Board's findings on five of the six charges.

The fact that the trial court clearly erred, however, does not preclude our independent review of the record. When a decision of the Superior Court reviewing an action of the Trial Board is appealed, this court uses the precise scope of review we employ in reviewing contested cases—a review of the administrative record to determine if there has been procedural error, if there is substantial evidence in the record to support the action of the Trial Board, or if the action is in some manner otherwise arbitrary, capricious or an abuse of discretion. *See* D.C.Code 1981, § 1–1510. In other words, we conduct the identical review that we would undertake if this appeal had been heard initially in this court.[9]

When agency findings are assailed on evidentiary grounds, as they are in this case, the test we use is whether the findings are supported by substantial evidence. *Johnson v. Board of Appeals and Review*, D.C.App., 282 A.2d 566, 571 (1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1175, 31 L.Ed.2d 232 (1972). Here, there was ample evidence to support each of the Trial Board's findings, and the trial court erred in substituting its own judgment on five of the six charges against appellant. Indeed, appellant himself did not dispute that he had failed to report his change of address, failed to request permission to engage in outside employment and had worked while on sick leave,[10] yet the trial court found that there was not substantial evidence to support these charges.

Furthermore, with respect to the disputed charges—malingering and making an

7. In a similar situation in which review of an agency action is initially in the trial court, the United States District Court for the District of Columbia uses the identical scope of review in reviewing decisions of the Civil Service Commission that the United States Court of Appeals for the District of Columbia Circuit applies when it reviews agency decisions. *Polcover v. Secretary of the Treasury*, 155 U.S. App.D.C. 338, 340, 477 F.2d 1223, 1225, *cert. denied*, 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973). The district court engages in limited judicial review, and its determination is based on the record before it. No *de novo* evidentiary hearing is permitted. *Id.* at 340–42, 477 F.2d at 1225–27. *See Doe v. Hampton*, 184 U.S.App.D.C. 373, 380, 566 F.2d 265, 272 (1977); *Dabney v. Freeman*, 123 U.S.App.D.C. 166, 168, 358 F.2d 533, 535 (1965); *Eustace v. Day*, 114 U.S.App.D.C. 242, 314 F.2d 247 (1962).

8. The transcript of the January 7, 1980 hearing reveals that the trial court was not even confident that the case properly belonged in the Superior Court—twice during the hearing the court questioned the attorneys as to whether the case should be in the Court of Appeals instead of the Superior Court.

9. We note that although review of Civil Service Commission decisions is initially in the district court, *see* note 7 *supra*, when the district court's decision is appealed to the United States Court of Appeals for the District of Columbia Circuit, the court of appeals reviews the Civil Service Commission decisions as if they had been brought originally in the court of appeals. *Polcover v. Secretary of the Treasury, supra* at 340–42, 477 F.2d at 1225–27.

10. Appellant also does not dispute that he left his service revolver in his cousin's automobile. He asserts however that the regulation only prohibits police officers from leaving their service revolvers in *their own* automobiles. We disagree and construe the regulation to cover all automobiles. The obvious purpose of the regulation is to prevent police officers from leaving their revolvers in locations that are readily accessible to other individuals. Furthermore, we note that the regulation was amended on August 11, 1980 to read: "Members are expressly prohibited from leaving their service weapons ... *in automobiles* ...."

untruthful statement pertaining to police duties—there is ample evidence of record to support the Trial Board's findings. The malingering charge was clearly supported by substantial evidence. Appellant, at the same time that he was being considered for retirement for disability, was secretly employed as a manual laborer. His activities at the Klingensmith construction site clearly cast doubt on the genuineness and extent of his physical disability. Moreover, once appellant learned that his employment with Klingensmith had been discovered by the MPD, he sought to return to police duty rather than to be retired. The Trial Board could reasonably conclude from this evidence that appellant had been feigning illness to avoid the performance of his police duties.

The record also supports the charge of making an untruthful statement pertaining to police duties. On May 20, 1976, appellant told Marguerite Anastasi, who was gathering information for a superior officer, that he had not worked since November 10, 1975, when in fact he had been employed by Klingensmith. In addition, when questioned by officers from the Internal Affairs Division on that same day, appellant stated that he had been employed as an elevator operator only, when in fact the videotapes of appellant's activities at work revealed otherwise.

 For these reasons, we conclude that there was sufficient evidence to sustain each of the Trial Board's findings. We, therefore, reverse the decision of the trial court which found that there was not substantial evidence to support the Trial Board's findings with respect to five of the six charges against appellant.[11]

*Reversed and remanded for affirmance of the Trial Board's ruling.*

11. Appellant contends that he was denied equal protection of the laws because he received a severe punishment. We disagree. Where, as here, a sanction is within an agency's statutory power to impose, an appellate court will not disturb the exercise of that discretion solely

APPENDIX

The specific charges and specifications were:

Charge No. 1:

Violation of General Order Series 1202, Number 1, Part I–E–4, to wit: "Malingering or feigning illness or disability in order to evade the performance of duty."

Specification No. 1:

In that at or about 1100 hours on November 10, 1975, Officer James W. Kegley did report himself sick and unfit for duty and that on or about January 9, 1976, and again on or about February 6, 1976, the said Officer Kegley did state to Dr. Victor H. Esch that he was unable to work— and that on or about May 20, 1976, the said Officer Kegley did state to Marguerite V. Anastasi that he had not performed any type of work anyplace since the said November 10, 1975; and the said Officer Kegley was feigning illness to avoid the performance of duty.

Charge No. 2:

Violation of General Order Series 1001, Number 1, Part I–E–2, to wit: "A member of the force on sick leave shall: . . . . Not accept or engage in any employment other than that of the police department."

Specification No. 1:

In that at or about 1100 hours on November 10, 1975, Officer Kegley did report himself sick and unfit for duty and that while on extended sick leave (without pay), the said Officer Kegley did become employed by the William F. Klingensmith Company, and he did work as a construction laborer (averaging approximately forty hours per week) between April 6, 1976 and May 18, 1976.

Charge No. 3:

Violation of General Order Series 201, Number 17, Part I–C–1, to wit: "A member desiring to engage in outside employ-

because that sanction is more severe than penalties levied in similar cases. *See Butz v. Glover Livestock Commission Co., Inc.,* 411 U.S. 182, 187, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973) (and cases cited therein).

ment shall notify the department of such intention by submitting P.D. Form 180 (Notification of Intent to Engage in Outside Employment) in quadruplicate, to his respective commanding officer prior to his acceptance of such employment."

Specification No. 1:

In that on April 6, 1976, Officer James W. Kegley did become employed by the William F. Klingensmith Company and the said Officer Kegley did fail to submit a P.D. Form 180 to his commanding officer.

Charge No. 4:

Violation of General Order Series 1202, Number 1, Part I–E–6, which reads in part: "Willfully and knowingly making an untruthful statement of any kind in any verbal or written report pertaining to his official duties as a metropolitan police officer to or in the presence of any superior officer or intended for the information of any superior officer. . . ."

Specification No. 1:

In that on May 20, 1976, after being informed by Marguerite V. Anastasi that certain information was intended for Inspector George R. Suter, Officer James W. Kegley did state that he had not worked anyplace since November 10, 1975, knowing the said information to be false.

Specification No. 2:

In that on May 20, 1976, while being questioned by Lieutenant Fred W. Raines, Officer James W. Kegley did state that he was employed by the William F. Klingensmith Company as an elevator operator only; and the said Officer Kegley did know this statement to be false.

Charge No. 5:

Violation of General Order Series 901, Number 1, Part I–G, which reads in part: ". . . . members of the force shall not leave their service weapons in . . . . automobiles, whether in or outside of the District of Columbia."

Specification No. 1:

In that sometime prior to 1845 hours on May 20, 1976, Officer James W. Kegley did place his department issued service revolver in the trunk of Mr. Richard Strickland's private automobile.

Charge No. 6:

Violation of General Order Series 201, Number 2, Part I–A–2, which reads in part: ". . . . members of the force . . . . shall report any change in such address, telephone number and marital status within 24 hours after such change."

Specification No. 1:

In that sometime prior to May 20, 1976, Officer James W. Kegley did move from 2815 Nicholson Street, Hyattsville, Maryland to 5402 75th Avenue, Lanham, Maryland, and change his phone; and the said Officer Kegley did fail to make the proper notifications.