**Marion BARRY, Jr., et al., Appellants,**

v.

**Russell L. HOLDERBAUM, Jr., Appellee.**

**No. 80–1368.**

District of Columbia Court of Appeals.

Argued Nov. 5, 1981.

Decided Dec. 22, 1982.

---

Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, and Charles L. Reis-

chel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellants.

Joel M. Finkelstein, Washington, D.C., with whom Carla J. Smith, Washington, D.C., was on the brief, for appellee.

Before NEBEKER, PRYOR and BELSON, Associate Judges.

NEBEKER, Associate Judge:

Appellee, Russell L. Holderbaum, Jr., was employed by the Metropolitan Police Department from July 1, 1968, until December 23, 1977. He was dismissed from the force following a hearing before the Metropolitan Police Department Trial Board (hereinafter Board) on April 4, 1977. Appellee was charged with indecently assaulting and exposing himself to two young girls, L.J. and S.B., ages four and five, respectively. In a split decision, the Board recommended that appellee be removed from the police force, finding him guilty of assaulting and exposing himself to L.J. The Board dropped the charges against appellee relating to S.B. On November 18, 1977, then Mayor Walter Washington [1] affirmed the Board's decision as to the assault charge, but found appellee not guilty of indecently exposing himself.[2] On December 23, 1977, appellee was removed from the force. In October of 1978, appellee sought judicial review of the Board's decision. He requested injunctive relief reinstating him in the police department. The matter came before the trial court on May 8, 1980, for a status hearing. At that time, Judge Stewart remanded the case to the Board for Findings of Fact and Conclusions of Law. Upon completion of the proceedings on remand, Judge Stewart issued his memorandum opinion. He concluded that the Board's decision that L.J. and S.B. were competent to testify was clearly erroneous. He held that the Board's

1. The court has, sua sponte, substituted Mayor Marion Barry for former Mayor Walter Washington. See D.C.App.R. 43(c)(1).

2. Officer Holderbaum was found guilty of violating General Order Series 1202, Number 1, Part I, Paragraph E–16, which prohibits conduct "prejudicial to the reputation and good

order of the police force ...." Because the alleged incident occurred in Maryland, common law assault and battery charges were brought against Holderbaum in that state. However, the charges were subsequently dismissed by the Maryland State's Attorney after he questioned both girls and their parents.

Findings of Fact and Conclusions of Law based thereon were "unsupported by substantial evidence in the record as a whole and the conclusions were therefore erroneous and must be set aside." The court ordered that appellee be retroactively reinstated as an officer with the Metropolitan Police Department, with all time lost since December 23, 1977, being properly charged to administrative leave. Basing our decision solely on the lack of substantial evidence, we affirm.[3]

The evidence adduced before the Board consisted of testimony by the two children, their respective parents, appellee, his wife, and Sergeant Owen Lennon, who investigated the reported assault for the Montgomery County Police Department of Maryland. The parents' testimony was made up almost exclusively of their recitation of statements made to them by their children in response to questions. Sergeant Lennon testified concerning statements made to him by the children and their parents. There was no physical evidence. Before the testimony of the witnesses was taken, appellee's counsel objected to the admission of hearsay testimony by the parents relating statements made to them by their children. In addition, counsel objected to the taking of the children's testimony, arguing that they were incompetent to testify.

The witnesses stated that during the relevant period of May 1, 1976, to September 1, 1976, appellee lived with his wife in the same apartment complex as L.J. and S.B., and their families. S.B.'s family lived in the same building as appellee, and L.J.'s family resided in an adjacent building. Testimony from the children's parents, appellee, and his wife indicated that the children visited appellee at his apartment two or three times a week during that summer. The children usually visited during the morning hours. Appellee's wife, a registered nurse, worked a five-day 3:00 p.m. to 11:00 p.m. shift with varying days off so she was often home in the morning. The parents of both children knew of the visits and

did not object to them. At that time, the children's ages were three and four.

Appellee spent a great deal of time in his apartment as he was on extended sick leave from the police force due to a back condition. Because of that injury, appellee often remained in bed or otherwise rested his back, frequently wearing pajamas throughout the day. He described his pajamas as scrub pants of the type worn by surgeons, with no front opening and held together with a string.

On September 2, 1976, the mothers of L.J. and S.B. were on an errand together when they began to discuss appellee and the fact that he frequently wore pajama pants around his apartment. Until then, neither child had given any indication that she had been subjected to any indecent or otherwise unusual treatment by appellee. Nevertheless, L.J.'s mother decided to speak with her daughter that evening. Mrs. J. testified that she "did not think anything would come of it," but that she "had a strange feeling about the man." Mr. and Mrs. J. both spoke with L.J. Following their conversations, they contacted the Montgomery County Police Department. Their report ultimately resulted in appellee's hearing before the Metropolitan Police Trial Board.

L.J. testified at the Board's hearing and said that she knew the difference between right and wrong, and that she is punished when she does not tell the truth. She stated she colored in school and that the right way to color is between the lines. She said that it is wrong to make noise in class when the teacher says to be quiet, and that she must sit by the teacher's desk when she does something the teacher has told her not to do. Over appellee's counsel's objection, Inspector Lloyd W. Smith, Chairman of the Board, stated that L.J. had demonstrated that she knew the difference between right and wrong, but said he wanted to see if she was capable of answering some questions before deciding her competence to testify. After eliciting from L.J. that she visited

---

**3.** As we find the lack of substantial evidence in this case to be controlling, we need not concern ourselves with the extent to which the trial court departed from this issue.

appellee's apartment where she played with his cat and plants, the following questioning took place by government counsel.

Q [L.J.] sit up and answer very loud.
A What?
Q [L.J.] did you ever play any games with Russell?
A No.
Q Did Russell ever hold you?
A No.
Q Did Russell ever touch you?
A Yeah.

\* \* \* \* \* \*

Q Tell us how he touched you?
A With his finger.
Q Would you tell us how he touched you with his finger? Keep your voice up, and tell us how he touched you with his finger. Where?
A Right down here.
[CORPORATION COUNSEL]: Would the record reflect the fact she has pointed to her vaginal area, Mr. Chairman.
[CORPORATION COUNSEL]
Q What did he do when he touched you there?
A I don't know.
Q With what did he touch you? What did he use to touch you?
A His finger.
Q Were you dressed at the time he touched you?
A Yeah.
Q How many times did he do this? How many times did he touch you? Was it more than once? Do you know?
A No.
INSPECTOR SMITH [Chairman, Trial Board]: You said Russell touched you down there. Do you want to stand up and show me where he touched you? Can you do that?
[CORPORATION COUNSEL]: Just stand like that and show him.
INSPECTOR SMITH: Where did Russell touch you?
[L.B.]: Here.
INSPECTOR SMITH: Did you have your clothes on?

[L.B.]: Yes.
INSPECTOR SMITH: Did you pull your clothes down when he touched you there?
[L.B.]: No.

\* \* \* \* \* \*

INSPECTOR SMITH: Did you tell Russell he had touched your vagina?
[L.B.]: Yeah.
INSPECTOR SMITH: Did you tell [your mother that] you had your clothes on [when Russell touched you] or you had pulled your pants down?
[L.B.]: I told her I had my clothes on.
INSPECTOR SMITH: You told her you had your clothes on?
[L.B.]: (Nods head affirmatively)

Mrs. J. testified that she took L.J. into the bathroom of their apartment for their discussion, and asked L.J. whether anyone had ever tickled her "bug," which at the time was L.J.'s word for sexual organ, whether male or female. Mrs. J. stated that her daughter understood the question, but that she just shrugged her shoulders like she did not want to answer. Mrs. J. then asked if "Russell ever tickled you there, on your bug?" L.J. shook her head yes and responded yes. When asked how it was done, L.J. "pulled her pants open . . . open and down" and rubbed her index finger in an "up and down motion" on her vagina. Later that day, Mr. J. testified that L.J. also told him that appellee had touched her vagina. Sergeant Owen Lennon of the Montgomery County Police Department testified regarding a conversation he had with L.J. on September 18, 1976. He stated that L.J. was unable to independently relate to him exactly what had happened in appellee's apartment. However, in response to his questions, L.J. told him that appellee touched her, pointing to her groin, and that appellee had lowered her slacks to just above her knees.

In its findings of fact, the Board found that L.J. was competent to testify. Upon review of the Trial Board decision, the Superior Court discounted the testimony of L.J.'s parents and that of Officer Lennon,

to the extent that they repeated statements made by L.J., on the ground that her statements to them had been in response to leading questions. It also discounted L.J.'s testimony on the grounds that (1) the testimony was inconsistent with her previous statements to her parents and Sgt. Lennon, (2) it was disjointed and confusing, and (3) L.J.'s competence to testify had not been adequately demonstrated. The court also stated that L.J.'s understanding of right and wrong was limited to her appreciation that if she did wrong, she would be punished.

The court rested its judgment primarily on the ground of L.J.'s competence. The court stated:

> [T]he Trial Board determination that L.J. [was] competent was clearly erroneous and an abuse of discretion. It is clear from the record that [she did not possess] the capacity to observe and understand the events in question nor could [she] independently recall or communicate [her] observations with sufficient clarity, accuracy or consistency. Under these circumstances the testimony . . . was clearly incompetent and any findings based on such testimony cannot be upheld. To do so would clearly be a denial of due process of law. The Trial Board's findings of fact and conclusions of law based thereon are therefore unsupported by substantial evidence in the record as a whole and the conclusions are therefore erroneous and must be set aside. [Footnote omitted.]

The court thereupon reversed the Board's decision and this appeal followed.

 Tenure of an officer of the District is not directly reviewable by this court. D.C.Code 1981, § 1–1502(8)(B). Review is properly in the Superior Court, *see Money v. Cullinane,* D.C.App., 392 A.2d 998, 1000 n. 2 (1978), and the scope of the Superior Court's review is identical to this court's

scope of review of contested cases under the District of Columbia Administrative Procedures Act (DCAPA). D.C.Code 1981, § 1–1510. *Kegley v. District of Columbia,* D.C. App., 440 A.2d 1013, 1019 (1982). It is limited to "a review of the administrative record to determine if there has been procedural error, if there is substantial evidence in the record to support the action of the Trial Board, or if the action is in some manner otherwise arbitrary, capricious or an abuse of discretion." *Id.* The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jameson's Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Bd.,* D.C.App., 384 A.2d 412, 418 (1978). Our review of the record leads us to conclude that the action of the Board is not supported by substantial evidence.[4]

 We base our decision primarily upon the unique posture and circumstances of this case. First, the complaint against Holderbaum had its genesis in the extraction of a story from L.J. by her mother. There was no evidence that either L.J. or S.B. ever made a fresh or excited complaint about how Holderbaum had hurt them or where Holderbaum had touched them. There was no evidence that either child ever made any spontaneous comments about the games they played with Holderbaum or about Holderbaum's penis or that Holderbaum took off his clothes. There was no evidence pertaining to the allegations at all except repetitions of L.J.'s many renditions of what she said had occurred.

Second, each version of L.J.'s story was obtained only through the use of highly suggestive and leading questions. The various accounts resulting from this type of questioning were widely divergent. For example, L.J. told her father that Holder-

---

4. We note that the Metropolitan Police Department's Handbook for Trial Board Members is confusing with regard to the standard of proof required in its proceedings. Two standards, those of "clear evidence" and "substantial evidence," are alluded to within the Handbook. We need not decide whether substantial evi-

dence, a traditional review standard, is sufficient for administrative factfinding, or whether preponderance of the evidence or greater is required, *see Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), as under the circumstances presented here, the evidence fails to meet the lower standard.

baum made her take her clothes off. She told her mother that her pants were unbuttoned and pulled open, not all the way down but enough to see her vagina, but she didn't say whether Holderbaum or she did it. She told Sgt. Lennon that Holderbaum pulled her pants down to her knees. Finally, L.J. told the Board on three separate occasions that she had her clothes on at all times. L.J. told the Board that she had never seen any man's penis, that Holderbaum's "vagina" was soft, and that Russell always had his clothes on. Yet she compared Holderbaum's penis to her mother's pen but it was longer and harder, told Mrs. J. that Holderbaum had pulled his pants down, and that Holderbaum's "privates" looked like her father's. L.J.'s testimony seemed to go in whatever direction indicated by the question asked. Her testimony was, therefore, inherently inconsistent and confusing.

Finally, we note that L.J.'s story was completely uncorroborated. While corroboration of the complainant's testimony is not a requirement in other than criminal cases of this nature, *Fitzgerald v. United States,* D.C.App., 443 A.2d 1295 (1982), we find its absence significant here. No independent testimony was advanced, and no physical evidence of any sort was produced. The sum and substance of the case against Holderbaum consisted of recitals of conversations with L.J. and her highly plastic responses at the hearing. As indicated previously, the various accounts of the story she proffered differed substantially with respect to the most basic aspects of the charges. Additionally, we recognize that Holderbaum was cleared of any wrongdoing with S.B.

Accordingly, given all of the circumstances present, we hold that the evidence presented to the Board lacked the requisite substantiality to justify its decision.

*Affirmed.*