Brian R. KENNEDY, Appellee/Cross–
Appellant,

v.

DISTRICT OF COLUMBIA,
Appellant/Cross–
Appellee.

Nos. 91–CV–1503, 91–CV–1504.

District of Columbia Court of Appeals.

Argued Sept. 22, 1993.
Decided Sept. 12, 1994.
Order Resolving Question on
Rehearing Feb. 16, 1995.

Patrick W. Shea, with whom Arthur B. Spitzer, Washington, DC, was on the brief, for appellee/cross-appellant.

Karen L. McDonald, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, was on the brief, for appellant/cross-appellee.

Before FERREN and SCHWELB, Associate Judges, and PRYOR, Senior Judge.

PRYOR, Senior Judge:

The Superior Court reversed a decision of the Mayor's Special Assistant and reinstated the Equal Employment Opportunity Director's ruling that the District of Columbia Fire Department's grooming regulations violated the District of Columbia Human Rights Act. Both parties appeal. Brian R. Kennedy, a former employee of the Fire Department, claims that the trial court erred in denying his claims for compensatory damages, attorneys fees, and Rule 11 sanctions. Opposing these claims, the District contends that Kennedy's claims are now moot due to his disability retirement from the Department. The District further maintains that the trial court erred by concluding that the District of Columbia Fire Department's facial and hair length regulations for male firefighters were discriminatory as applied to Kennedy. After reviewing the record and the parties' respective contentions, we affirm in part and reverse in part, and remand.

## I. Procedural History

The District of Columbia Fire Department's ("Department") grooming regulations ("Regulations") require male firefighters to be cleanly shaven and to have short hair.[1] In contravention of these regulations, Kennedy grew a "handlebar moustache" and a beard—actions which prompted disciplinary proceedings which resulted in his being dismissed from the Department. On December 15, 1980, Brian R. Kennedy filed a complaint with the Director of Equal Employment Opportunity ("EEO") for the Government of the District of Columbia, alleging that the grooming regulations violate both the Mayor's Order 75–230, 1975 D.C.Stat. 510, and the Human Rights Act of 1977, D.C.Code §§ 1–2501 to –2557 (1992 Repl.).

An administrative hearing was convened which resulted in a finding by the hearing examiner that the Department's Regulations (1) were not uniformly and equally applied to Department employees, (2) were not an essential component of an employee's uniform, (3) did not foster *esprit de corps* among the employees, and (4) were not rationally based on a safety justification. In addition, the hearing examiner proposed new grooming regulations to be implemented by the Department.

On August 8, 1983, the EEO Director, adopting the recommendations of the hearing examiner, ordered Kennedy's reinstatement on grounds that the grooming regulations as applied to Kennedy were unlawfully discriminatory on the basis of personal appearance. Kennedy was subsequently awarded reinstatement with back pay, but denied compensatory damages, attorneys fees, and punitive damages.[2]

Pursuant to § 6(a)(8) of Mayor's Order 75–230,[3] the Department sought review of the Director's decision. On September 26, 1983, the Mayor designated Carol Lowe, Special Assistant to the City Administrator, to review the EEO Director's decision. On May 14, 1985, Special Assistant Lowe reversed the EEO Director's decision and upheld the Department's grooming regulations. In her decision, the Special Assistant held that both Mayor's Order 75–230, 1975 D.C.Stat. 510, and the Human Rights Act of 1977, D.C.Code §§ 1–2501 to –2557 (1992 Repl.), permitted the Department to regulate different hair lengths for male and female employees.

---

**1.** The relevant regulations are summarized as follows:

(1) Article XXI, section 20(c) of the Fire Department Order Book provides that beards are not permitted. However, an employee suffering from pseudofolliculitis barbae ("barbers itch") is allowed to wear a neatly trimmed one-quarter inch beard as long as he continues to suffer from this condition.

(2) Article XXI, section 20(b) allows female employees to wear hairpins, hairpieces, or wigs in order to comply with the hair length requirements. However, section 20(a) does not provide such options to male employees with respect to their hair length.

**2.** Appellant does not appeal the court's denial of punitive damages and, accordingly, we do not decide the issue.

**3.** "[D]ecisions and orders [rendered by the EEO Director] shall be subject to review by the Mayor...." Mayor's Order 75–230 § 6(a)(8), 1975 D.C.Stat. at 514.

Moreover, she held that the evidence before the hearing examiner supported the Department's safety justification for its facial hair regulation.

Kennedy filed two petitions in this court which were subsequently consolidated. *See Kennedy v. Barry,* 516 A.2d 176, 180 (D.C. 1986). The first petition questioned the Special Assistant's authority to review the order as well as her delay in rendering a decision and requested a writ of mandamus ordering the Department to comply with the EEO Director's order. The second petition sought to overturn the Special Assistant's decision. In opposition, the District of Columbia argued, *inter alia,* that Kennedy's claims did not rise to the level of a "contested case" pursuant to D.C.Code § 1–1510(a), and thus, this court was without jurisdiction. We agreed and dismissed Kennedy's petitions. 516 A.2d at 180.

On May 18, 1987, Kennedy filed an amended complaint for equitable relief in the Superior Court requesting the reinstatement of the Director's decision. In a reversal of its previous position, the District of Columbia filed a motion to dismiss the amended complaint on the ground that the matter involved a contested case which required Kennedy to seek review in this court. Kennedy opposed this motion and moved for sanctions under Superior Court Civil Rule 11. The Superior Court correctly asserted jurisdiction and found the Special Assistant's decision to be unsupported by the evidence, thus reinstating the EEO Director's decision in favor of Kennedy. In addition, the court denied Kennedy's claim for Rule 11 sanctions. Both Kennedy and the District appeal from those rulings.

## II. Mootness

■ At the threshold, we address the District's contention that Kennedy's claim for equitable relief is moot because he retired from the Fire Department prior to the time the Superior Court rendered its decision. We disagree.

■ Although the concept of mootness is grounded on the firm principle that "parties in a judicial proceeding must have a concrete stake in the outcome[,]" *In re An Inquiry into Allegations of Misconduct Against Juveniles Detained at and Committed at Cedar Knoll Inst., Dep't of Human Resources,* 430 A.2d 1087, 1092 (D.C.1981) (citations omitted), it is clear that unresolved issues of damages, as are present here, constitute a sufficient "concrete stake" in the litigation. Such issues are therefore properly before us irrespective of Kennedy's retirement. *Board of Pardons v. Allen,* 482 U.S. 369, 370–71 n. 1, 107 S.Ct. 2415, 2417 n. 1, 96 L.Ed.2d 303 (1987) (prisoners' release on parole did not render action seeking compensatory damages in addition to declaratory and injunctive relief, moot).[4] Similarly, we note that Kennedy's appeal from the Superior Court's denial of his claim for sanctions under Rule 11 is also properly before us.

In addition, the Supreme Court has carved an exception to its general insistence that a litigant maintain a "concrete stake" in the action to encompass those scenarios which are "capable of repetition, yet evading review." *See Southern Pacific Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). This exception traditionally applies when (1) the challenged action is in its duration "too short to be fully litigated prior to its cessation or expiration," and (2) there is a "reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam) (citing *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)).

■ Notwithstanding federal cases to the contrary, "[t]his court has declined to adhere strictly to [these] requirements," and has not insisted that the conduct be threatened against the same complaining party. *In re W.L.,* 603 A.2d 839, 841 (D.C.1991) (citing *Lynch v. United States,* 557 A.2d 580, 582 (D.C.1989) (en banc)). Accordingly, where the pursuit of administrative and judicial avenues of redress outdistances the tenure or

4. Although the government maintains that Kennedy failed to preserve his right to appeal the EEO Director's denial of such relief, the record belies this contention.

legal status of the complaining party, and the challenged conduct threatens to go unchecked, an adjudication on the merits is appropriate. *See United States v. Edwards*, 430 A.2d 1321, 1324 n. 2 (D.C.1981) (en banc), *cert. denied*, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982). For this reason as well, this case is properly before us.

### III. Scope of Review

■ In addressing the merits of the dispute, our scope of review in this case is unusual. Although this case comes to us from the Superior Court's reversal of the Special Assistant's reversal of the hearing examiner's ruling and reinstatement of the EEO Director's decision, our primary task is not simply to review the Superior Court's decision for error or abuse of discretion.[5] Rather, we approach the case as if the appeal arose directly from the administrative agency. *See Davis v. Univ. of the District of Columbia*, 603 A.2d 849, 851 (D.C.1992); *Kegley v. District of Columbia*, 440 A.2d 1013, 1018 (D.C.1982); *Barry v. Wilson*, 448 A.2d 244, 246 (D.C.1982) (per curiam).

■ When reviewing the decision of an administrative agency, we must first assure ourselves that the agency's "findings" are more than a reiteration of the evidence. Because these findings form a necessary "basis for a meaningful review by this court and also [ ] inform the parties of the facts proven and relied on by the [administrative agency]," we will not accept "generalized, conclusory or incomplete findings." *Newsweek Magazine v. District of Columbia Comm'n on Human Rights*, 376 A.2d 777, 784 (D.C. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978).

■ Once satisfied that this threshold is met, our review function, then, is to determine whether there exists a " 'rational connection between the facts found and the choice made,' " *Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n*,

402 A.2d 36, 41 (D.C.1979) (quoting *Brewington v. Board of Appeals and Review*, 299 A.2d 145, 147 (D.C.1973) (citation omitted)), and whether the agency's findings of fact are supported by substantial evidence in the record considered as a whole. *Greater Washington Business Ctr. v. District of Columbia Comm'n on Human Rights*, 454 A.2d 1333, 1337 (D.C.1982). *See also 4934, Inc. v. District of Columbia Dep't of Employment Servs.*, 605 A.2d 50, 53 (1992); D.C.Code § 1–1510(a)(3)(E) (1992 Repl.). Mindful that substantial evidence " 'means more than a mere scintilla' " we will uphold an administrative decision if bottomed on " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Shaw Project Area Comm., Inc. v. District of Columbia Comm'n on Human Rights*, 500 A.2d 251, 255 (D.C.1985) (per curiam) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

■ The application of this standard of review binds us to two axioms of administrative law. On the one hand, upon review of the factual predicate underpinning the administrative decision, we have repeatedly held that "a hearing examiner's decision has been entitled to greater consideration if the examiner, as in this case, has heard live testimony and observed the demeanor of the witnesses." *Gunty v. District of Columbia Dep't of Employment Servs.*, 524 A.2d 1192, 1197 (D.C.1987) (quoting *Dell v. District of Columbia Dep't of Employment Servs.*, 499 A.2d 102, 106 (D.C.1985)).[6]

■ On the other hand, when assessing the application of such facts to the pertinent regulations, "this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Particularly where the interpretation

---

5. However, we recognize that the Superior Court's decision must be considered with respect to its denial of Kennedy's claim for sanctions under Rule 11 which was initially made in the trial court.

6. Moreover, an agency Director sitting in an appellate posture may not reject an examiner's findings of disputed fact based on a determination of witness credibility unless the findings are unsupported by substantial evidence. *Gunty, supra*, 524 A.2d at 1198.

of an administrative regulation is in issue, "the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* at 16–17, 85 S.Ct. at 801 (quoting *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).

Accordingly, the Special Assistant, the Director and, indeed this court, can only reverse the hearing examiner's findings of fact if they were unsupported by substantial evidence, and overturn their ruling on the questioned conduct if plainly erroneous or inconsistent with the pertinent regulatory scheme. *See McMullen v. Police and Firefighter's Retirement and Relief Bd.*, 465 A.2d 364, 366 (D.C.1983) (per curiam) ("A reviewing court must affirm an agency's findings of fact and conclusions of law if they are supported by reliable, probative and substantial evidence in the record") (citing *Kegley, supra,* 440 A.2d at 1018).[7]

### A. District of Columbia Human Rights Act

As applied to public employees, the District of Columbia Human Rights Act ("DCHRA") is governed by Mayor's Order 75–230, pursuant to which, "the District of Columbia Government has promulgated regulations governing the human rights of its employees and applicants for employment...." Mayor's Order 75–230, 1975 D.C.Stat. 510. The Mayor's Order prohibits discriminatory employment practices based upon an employee's "race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, physical handicap, or political affiliation...." Mayor's Order 75–230 § 2(a), 1975 D.C.Stat. at 511. The Order defines "personal appearance" as "the outward appearance of any person, irrespective of sex, with regard to bodily condition or characteristics, manner or style of dress, and manner or style of personal grooming, including, but not limited to, hair style or beards." *Id.* at 512.

While expansive, this definition is not without limitation. The Order provides that an employer may impose requirements relating to "cleanliness, uniforms, or prescribed standards, when uniformly applied to a class of employees, for a reasonable business purpose; or when such bodily conditions or characteristics, or style or manner of dress or personal grooming presents a danger to the health, welfare or safety of any individuals." *Id.*

It is against this framework that we ask whether (1) the hearing examiner's finding, that the Department's facial hair regulation and hair length regulations, were discriminatory as applied to Kennedy and not excused by a "reasonable business purpose" or a consideration of "health, welfare or safety," is supported by substantial evidence; and (2) whether these findings are consistent with the Human Rights Act.

### B. Facial Hair Regulations

The Department's regulation regarding facial hair for male employees provides:

The face shall be left clean shaven, except that a well-trimmed mustache is permissible. If worn, the mustache shall not extend more than ¼ inch beyond the corners of the mouth. Mustaches shall be trimmed in such a manner as to leave the upper lip visible and no portion extending beyond the corners of the mouth shall fall more than ¼ inch below a line parallel with the bottom of the lower lip. *Handlebar mustaches, goatees, and beards are not permitted, except that officers and members suffering from folliculitis barbae ... may wear a beard ¼ inch in length and neatly trimmed.... No facial hair that would interfere with the proper seal of the airmask facepiece or oxygen mask mouthpiece shall be permitted.*

Article XXI § 20(c) of the District of Columbia Fire Department Order Book (emphasis added).

The hearing examiner heard testimony from Kennedy, Fire Chief Theodore R. Coleman, Deputy Fire Chief Hubert Clarke, Safety Officer Captain Darl McBride, and

---

7. In this instance, we observe that the Director of Equal Employment Opportunity has specialized expertise respecting equal rights issues, whereas the Special Assistant does not.

Local No. 36 President, Sergeant William Mould. In their respective capacities as members of the Department, each testified whether the grooming regulations promoted the safety or reasonable business objectives of the Department. The reasonable business objectives were further delineated into the subcategories of uniformity, *esprit de corps*, and morale.

In its defense of the facial hair regulation, the Department stressed that its prohibition on facial hair is necessary because of the potential that such hair could interfere with the proper seal between the firefighter's face and the facemask of the firefighter's self-contained breathing apparatus ("SCBA"). The testimony was uniform that an adequate seal is imperative to protect the firefighter from smoke, vapors, toxic gases and other contaminants.

Further testimony at the hearing cited scientific studies which suggest that the presence of facial hair increases the likelihood that an effective seal of the facial masks and the attached breathing apparatus will not be maintained. Moreover, the manufacturer of the facial mask includes a warning that the masks are "not to be used with facial hair."

The evidence further demonstrated, however, that of the approximately twenty firefighters who were afflicted with pseudofolliculitis barbae ("PFB") and were allowed to wear short beards, there were no reported incidents resulting from improperly secured face masks in the past seven years.

Moreover, department regulations demand that each SCBA be tested twice daily to ensure a proper seal on the individual firefighters. During this test, a firefighter places the mask on his face, closes off the intake hose and inhales. If the mask adheres, a proper seal has been achieved. In fact, during the hearing, Kennedy performed such a test and demonstrated that he could obtain a proper seal despite the presence of his beard and handlebar mustache.[8]

Regarding uniformity, *esprit de corps* and morale, the evidence revealed that the Department's grooming regulations are not uniformly applied and, in fact, vary from one engine company to another and from one officer to another. For example, there was unrefuted testimony that, in addition to those firefighters with a medical exemption, at least two Department members sported beards.

The testimony also indicated that the public has little difficulty in identifying firefighters. While engaged in firefighting activities, the firefighters wear coats, hats and shoulder patches emblazoned with Departmental insignia. There has only been one reported incident where a member of the public failed to recognize a firefighter because of his beard. Significantly, no evidence was adduced indicating that the public would not respond to the directive of a firefighter with facial hair.

Regarding *esprit de corps* and morale, the Department's senior management testified that strict enforcement of the uniform and grooming requirements promote a necessary team spirit. To the contrary, Kennedy and Union President Mould testified that members of the department disagreed with this assessment. They testified that because members of the Department view the grooming regulations as "silly" and inconsistently enforced, the regulations result in undermining Departmental morale and diminishing respect for Departmental authority. This sentiment is supported by the firefighter's union which promotes an equally applied rule that permits all Department members to wear a neatly-trimmed beard irrespective of medical condition.

After reviewing the above regulations and the evidence presented at the hearing, the examiner concluded that a *prima facie* case of employment discrimination had been proven. In particular, the hearing examiner held that "[t]he entire safety justification is undercut in part because of the differential treat-

---

8. It is also worth noting that technological advancements relating to fire protection equipment have been made since the time Kennedy first initiated his case at the EEO in 1980. At the time of Kennedy's hearing, the Department had already possessed 167 positive pressure face-masks which are designed to accommodate short beards by preventing any inward leakage of harmful contaminants. In addition, the Department was in the process of procuring more positive pressure face-masks at that time.

ment between those with pseudofolliculitis barbae and those without it, because the legitimate medical rationale for this treatment has no relationship to the seal." Moreover, "[i]f the seal is the basis for the rule concerning the mustache, and it appears to be, then in the direct evidence before me in the proceeding it must fall because Mr. Kennedy was able to secure a seal...."

Addressing the District's position that the Department's grooming regulations foster discipline or an *esprit de corps*, the hearing examiner found that "the grooming regulations specifically undermine the sought team spirit and respect for authority within the Fire Department."[9]

Despite the Department's asserted safety justification for the regulation, the Fire Chief conceded that a firefighter with a one-quarter inch beard would be reasonably safe in wearing his face mask in a contaminated atmosphere. In addition, Kennedy demonstrated at the hearing that he was able to safely secure his oxygen mask in spite of his beard and moustache. Significantly, only the management level of the Department adopts the posture that grooming regulations boost morale. The hearing examiner chose to give more credence to the contrary testimony of the firefighters and their union representative.

It is settled that "due deference must be accorded the credibility determinations of the examiner who *heard and evaluated the evidence.*" *Gunty, supra,* 524 A.2d at 1197 (emphasis added); *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 468–69, 95 L.Ed. 456 (1951). In the instant action, such deference is warranted. The hearing examiner took pains to render "a finding on each material fact necessary to support the conclusions of law[,]" *Newsweek, supra,* 376 A.2d at 784 (*citing Dietrich v. District of Columbia Bd. of Zoning Adjustment,* 293 A.2d 470, 473 (D.C. 1972)), allowing for meaningful review, and these findings "support the end result in a discernible manner." *Dietrich, supra,* 293 A.2d at 473.

We conclude, therefore, that there is substantial evidence in the record to support the hearing examiner's conclusion that the Department's facial hair regulation was discriminatory as applied to Kennedy and that this conclusion "rationally flows" from these findings. *See Greater Washington Business Ctr., supra,* 454 A.2d at 1337; *4934, Inc., supra,* 605 A.2d at 53.[10] This does

---

9. The EEO Director concurred with the decision of the hearing examiner. The Special Assistant, however, reversed the hearing examiner's recommended decision, finding that there was sufficient evidence in the record which supported the Department's safety justification for the regulation. She viewed the Department's policy of allowing a small percentage of male firefighters afflicted with PFB to wear beards as a reasonable accommodation to a physical handicap. In substituting her judgment for that of the hearing examiner, the Special Assistant exceeded the scope of her authority by applying a *de novo* standard of review. *See Santos v. District of Columbia Dep't of Employment Servs.,* 536 A.2d 1085, 1088 (D.C.1988) (Director lacked authority to review *de novo* the evidence regarding a factual issue).

As indicated, the Special Assistant's scope of review was limited to determining whether there was substantial evidence in the record to support the examiner's findings. *See Gunty, supra,* 524 A.2d at 1197 (Director's review of a hearing examiner's credibility determinations is limited to whether there is substantial evidence in the record supporting the determinations); *see also Dell, supra,* 499 A.2d at 107.

Rather than deciding whether the evidence supported the hearing examiner's findings, the Special Assistant made her own findings *de novo*. In so doing, the Special Assistant's actions were in contravention of our ruling that "[i]f there is substantial evidence to support the [hearing examiner's] finding, the mere existence of substantial evidence to the contrary does not allow the reviewing [body] to substitute its judgment for that of the [hearing examiner]." *See Scott v. Police and Firemen's Retirement and Relief Bd.,* 447 A.2d 447, 449 (D.C.1982) (per curiam) (citing *Spevak v. District of Columbia Alcoholic Beverage Control Bd.,* 407 A.2d 549 (D.C.1979)).

10. Similarly, we are not troubled by the hearing examiner's proposal that the grooming regulations be modified in accordance with the language he set forth in the appendix to his opinion. Pursuant to Mayor's Order 75–230, a hearing examiner has the power to "[i]ssue recommendations, prepare and deliver to the Director [of] EEO a hearing examiner's report which shall include a brief and concise statement of the history of the subject matter of the hearing, findings of fact, conclusions of law, analysis, and recommended decision or proposed order." Mayor's Order 75–230 § 11(b), 1975 D.C.Stat. at

not, of course, preclude the Department from promulgating a reasonable grooming regulation, equally applied to all, requiring beards to be neatly trimmed.

## IV. Hair Length Regulation

In addition to his challenge against the Department's facial hair regulation, Kennedy also contends that he was discriminated against on the basis of his sex as the Department applied two distinct hair length regulations for male and female employees. The language provided in the Department's hair length regulations for male and female employees are the same except for the portion which has been highlighted in the regulation relating to female employees. The regulations provide:

a. *Hair—Uniformed Male Employees:*

Hair shall be neat, clean, and trimmed to present a tapered and groomed appearance. It shall not be of such length and/or bulk that it prevents the uniform cap or safety helmet or hard hat from fitting securely on the head. Hair on the sides of the head may touch the top of the ears but not extend over the ears nor cover any portion of the outside surface of the ear. Hair on top of the head shall be neatly groomed. Hair on the back of the head may touch but shall not extend over the shirt collar. The hair shall be groomed so that when the head is covered the hair does not fall below the eyebrows nor interfere with a proper seal of the air-mask facepiece.

b. *Hair—Uniformed Female Employees:*

Hair shall be neat, clean, and *styled to present an attractive, groomed appearance.... Hairpins that are inconspicuous, hairpieces, or wigs may be used to comply with these regulations.*

Article XXI § 20 of the District of Columbia Fire Department Order Book (emphasis added).

During the administrative hearing, it was the position of the Departmental management that long hair posed a safety hazard in that it was susceptible to snagging and to being singed or burned. Testimony was adduced which recalled incidents where a firefighter's hair had been singed.

This position was countered by testimony which indicated that, while fighting fires, hair is concealed under the firefighter's helmet and any excess length is covered by the ear flaps and the collar of the firefighter's coat. In addition, an optional Nynex hood was available for purchase which would provide an extra layer of protection for those concerned firefighters. Moreover, the only time a firefighter's hair was singed was when that firefighter's helmet became dislodged and his hair became exposed.

Significantly, everyone testifying agreed that female firefighters are not in danger of singeing or burning their hair if they follow the guidelines by pinning or covering their hair. Once pinned or covered, the evidence indicated that it is safe for a female firefighter to enter a burning building because her hair is completely covered by her helmet.

▇▇▇▇ The hearing examiner concluded that the Department's hair-length regulations were not uniformly and equally applied to persons within the defined classes. However, in reaching this conclusion, he failed to propound any significant findings of fact in support. In contrast to the carefully crafted findings regarding facial hair, the examiner's findings as to hair length are conspicuously sparse. One fatal consequence of these sparse findings is that it deprives this court of the benefit of the basis for the hearing examiner's decision that the Department's hair length regulations are discriminatory.

▇▇▇▇ From the record, this court is unable to discern whether the hearing examiner's conclusion that the grooming regulations were discriminatory was grounded on the

519–20. Significantly, the hearing examiner's proposed modifications were prefaced by the word "should" as opposed to the other remedies which were prefaced by the word "shall." The word "should" denotes a directive which is "purely precatory." *Secretary of the Interior v. California,* 464 U.S. 312, 322 n. 9, 104 S.Ct. 656,

662 n. 9, 78 L.Ed.2d 496 (1984). *See also Santa Fe Pacific Realty Corp. v. United States,* 780 F.Supp. 687, 697 (E.D.Cal.1991) (finding "should" was not "mandatory language"). As it is well within the province of the hearing examiner to "issue recommendations," we find he did not exceed his authority by so doing.

finding that the Department's hair length regulation for male employees was neither uniformly nor equally applied within the class of male employees, or on the finding that the regulations were not uniformly and equally applied in comparison to female employees. The record does not supply this answer and we are proscribed from "fill[ing] the gap by making [our] own determination from the record." *See RosExpress, Inc. v. District of Columbia Dep't of Employment Servs.*, 602 A.2d 659, 661 (D.C.1992).

By omitting the necessary nexus between the testimony at the hearing and the conclusion of discrimination, the hearing examiner has deprived this court of a basis from which to decide error. "It is fundamental that '[w]e must know what a decision means before the duty becomes ours to say whether it is right or wrong.'" *2101 Wisconsin Assocs. v. District of Columbia Dep't of Employment Servs.*, 586 A.2d 1221, 1224 (D.C.1991) (quoting *United States v. Chicago, M. & St. P. & Pac. R.R.*, 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935)). Here, we are forced to make a leap from the "unassimilated, often contradictory testimony" in the record, *Citizens Ass'n of Georgetown, supra*, 402 A.2d at 42, to the "conclusions of law" without benefit of elaboration of "the continuum between testimony and final decision." *Id.*

We have repeatedly admonished "administrative agencies [to] specify the precise findings and conclusions which support their decisions." *Brewington v. District of Columbia Bd. of Appeals and Review*, 287 A.2d 532, 534 (D.C.1972). Here, this admonition has gone unheeded. Accordingly, we remand the case for further findings on the issue of hair length. *See Colton v. District of Columbia Dep't of Employment Servs.*, 484 A.2d 550, 552 (D.C.1984).

## V. Remedies

With respect to Kennedy's claims for relief, we recognize the trial court affirmed the hearing examiner's conclusion that he was entitled to back pay, benefits, and reinstatement to the Department as provided in Mayor's Order 75–230 § 19(b), 1975 D.C.Stat. at 526. If the Director finds that an employee of a department was discriminated against, the employee is entitled to back pay and reinstatement. *See* Mayor's Order 75–230 § 19(b)(1), 1975 D.C.Stat. at 526. In light of our decision that there is substantial evidence in the record to support the Director's finding that the Department's facial hair regulation was discriminatory as applied to Kennedy, we likewise find that it was not error for the hearing examiner to award back pay and reinstatement to Kennedy under Mayor's Order 75–230. *See generally Wisconsin Ave. Nursing Home v. District of Columbia Comm'n on Human Rights*, 527 A.2d 282, 291 (D.C.1987) (employee who is found to be a victim of employment discrimination is ordinarily entitled to receive back pay).

With regard to Kennedy's claim for compensatory damages and attorneys fees, the trial court upheld the EEO Director's decision that Kennedy was not entitled to either of these remedies. Section 19(b) of Mayor's Order 75–230 states:

When the Director [of] EEO finds that an employee of a department was discriminated against and as a result of that discrimination was denied an employment benefit, or an administrative decision adverse to him was made, the department shall take remedial actions which shall include one or more of the following, *but need not be limited to these actions:*

(1) Retroactive promotion, with backpay ...

(2) Consideration for promotion ...

(3) Cancellation of an unwarranted personnel action and restoration of the employee ...

(4) Expunction from the department's records of any reference to or any record of unwarranted disciplinary action ...

(5) Full opportunity to participate in the employee benefit denied him....

Mayor's Order 75–230 § 19(b), 1975 D.C.Stat. 526–27 (emphasis added).

Kennedy contends that compensatory damages and attorneys fees are available remedies in section 19(b) because it states that remedial actions "need not be limited" to those enumerated. While there is some question as to whether a public employee in

the District may recover compensatory damages under Mayor's Order 75–230, see *Lamont v. Rogers,* 479 A.2d 1274, 1277 (D.C. 1984) (rejected government's argument that a public employee was limited to those remedies spelled out in section 19(b)), we need not resolve these questions in this case as the hearing examiner denied Kennedy's request for compensatory damages and related fees on the basis that the meager record did not support such recoveries, a conclusion with which we take no issue.

## VI. Rule 11 Sanctions

■ Turning to Kennedy's claim that the Superior Court erred in denying his motion for sanctions pursuant to Rule 11, we note that appeals which involve Rule 11 sanctions are generally based upon a trial court's imposition of sanctions. *See generally Gray v. Washington,* 612 A.2d 839 (D.C.1992); *Williams v. Board of Trustees of Mount Jezreel Baptist Church,* 589 A.2d 901 (D.C.), *cert. denied,* 502 U.S. 865, 112 S.Ct. 190, 116 L.Ed.2d 151 (1991); *Montgomery v. Jimmy's Tire & Auto Ctr., Inc.,* 566 A.2d 1025 (D.C. 1989). Here, the trial court refused to impose sanctions. Nonetheless, our standard of review of a trial court's denial of a party's motion for Rule 11 sanctions remains essentially the same. In reviewing a trial court's denial of a Rule 11 motion, "we ... determine whether the trial court abused its discretion...." *See Stansel v. American Sec. Bank,* 547 A.2d 990, 995 (D.C.1988), *cert. denied,* 490 U.S. 1021, 109 S.Ct. 1746, 104 L.Ed.2d 183 (1989). In other words, "the court has a range of choice, and [ ] its decision will not be disturbed *as long as it stays within that range* and is not influenced by any mistake of law." *United States v. Dockery,* 293 U.S.App.D.C. 357, 361, 955 F.2d 50, 54 (1992) (quoting *Kern v. TXO Production Corp.,* 738 F.2d 968, 970 (8th Cir.1984)) (emphasis in *Dockery*).

■ The relevant language of Rule 11 provides:

The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation....

Super.Ct.Civ.R. 11. This rule has been interpreted to apply only to writings and not oral assertions at trial. *Williams, supra,* 589 A.2d at 910. In its consideration of a Rule 11 motion, the trial court must embark upon a two-part process: (1) it must determine whether a Rule 11 violation occurred, and (2) if a violation has occurred, a sanction must be imposed. *Id.* "In deciding whether Rule 11 has been violated, the trial court focuses only on whether 'reasonable pre-filing inquiry would have disclosed that the pleading, motion, or paper was not well grounded in fact, was not warranted by existing law, or was interposed for an improper purpose.'" *Id.* (quoting *Kleiman v. Aetna Casualty & Sur. Co.,* 581 A.2d 1263, 1266 (D.C.1990)).

■ Here, the trial court indicated that Kennedy's motion for sanctions was premised upon the government's earlier motion to dismiss in which it claimed his appeal from the Special Assistant's decision was a "contested case," thus making it a matter for our review. This basis for the government's motion was contrary to its previous position that Kennedy's claim was an "uncontested case" which made it a matter properly for the Superior Court. In denying Kennedy's motion for Rule 11 sanctions, the trial court provided:

Plaintiff's post-hearing Motion for Sanctions is based on defendants' change of position concerning whether the case any longer constituted an "uncontested case." This question was sufficiently confused by the procedural history of the case that the Court cannot conclude that defendants' change of position was not made in good faith.

It appears, on this record, that the trial judge did not apply the correct test, or stated another way, did not make the appropriate inquiry. *See Williams, supra,* 589 A.2d at 910. The judge focused on counsel's good faith, but the test under Rule 11 is not good faith, but reasonable inquiry. Accordingly,

we vacate the trial court's order denying the motion for Rule 11 sanctions and remand the matter to the trial court. *Id.* For the foregoing reasons, the order of the Superior Court is

*Affirmed in part, reversed in part and remanded for actions consistent with this opinion.*

SCHWELB, Associate Judge, concurring in part: [*]

I agree with the majority's disposition of the issue of facial hair and, generally, with most of what Judge PRYOR has written. In my opinion, however, the Fire Department's hair length regulations can be sustained on the present record.

## I.

Section 3 of the Mayor's Order defines "personal appearance," in pertinent part, as follows:

> The outward appearance of any person, ... including, but not limited to, hair style and beards. It shall not relate, however, to the requirement of cleanliness, uniforms, or prescribed standards, *when uniformity applied to a class of employees, for a reasonable business purpose....*

(Emphasis added). With respect to hair length, the controversy has focused largely on whether the prescribed standards have been "uniformly applied."

The hearing examiner made eight findings of fact (Nos. 14 through 21) pertinent to the issue of uniform application. Of these, only one dealt explicitly with hair length:

> 15. Women firefighters may use hairpins, hairpieces, or wigs to disguise long hair.

The hearing examiner further found as follows:

20. Enforcement of the grooming regulations varies from company to company, officer to officer.

21. Based upon the Findings of Fact ## 14 through 20, inclusive, I find that the Fire Department's regulations create three classes of grooming rules—women, male firefighters without pseudofolliculitis barbae, and male firefighters with pseudofolliculitis barbae—and that discipline under the grooming regulations has not been uniformly and equally applied to persons within the three defined classes.

In my opinion, these findings, even if clarified on remand, provide no basis for invalidating the Fire Department's hair length standards.

## II.

The hearing examiner's first (and, I think, principal) reason for finding that the regulations have not been uniformly applied was that women firefighters are permitted to grow their hair longer than men, and may use hairpins or other devices to disguise their hair length. Differentiation between men and women in this regard, however, does not invalidate the regulations.

Title VII of the Civil Rights Act of 1964 prohibits discrimination in employment based on, *inter alia,* sex. 42 U.S.C. § 2000e *et seq.* The Act was aimed at rooting out all employment restrictions based on sexual stereotypes. *City of Los Angeles, Dep't of Water & Power v. Manhart,* 435 U.S. 702, 707, 98 S.Ct. 1370, 1374–75, 55 L.Ed.2d 657 (1978).[1] Courts construing this comprehensive remedial statute have recognized, however, that while men and women have equal rights, the two sexes are not the same. Different grooming requirements for men and women, including different rules as to the wearing of long hair, are permitted by Title VII so long as the burdens which they impose on the two sexes are comparable. *See, e.g., Dodge v.*

---

[*] Senior Judge Pryor is in general agreement with the legal analysis in this opinion, but believes for the reasons stated in the majority opinion that a remand is appropriate.

1. "In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women re-

sulting from sex stereotypes. [Title VII] subjects to scrutiny and eliminates such irrational impediments to job opportunities and enjoyment which have plagued women in the past." *Manhart,* 435 U.S. at 707 n. 13, 98 S.Ct. at 1375 n. 13 (quoting *Sprogis v. United Airlines, Inc.,* 444 F.2d 1194, 1198 (7th Cir.1971)).

*Giant Food, Inc.,* 160 U.S.App.D.C. 9, 13, 488 F.2d 1333, 1337 (1973). Different hair length requirements for men and women do not foreclose job opportunities for either sex or impose greater burdens on one sex than they do on the other. *See Fagan v. National Cash Register Co.,* 157 U.S.App.D.C. 15, 23–25, 481 F.2d 1115, 1123–25 (1973) (collecting authorities); *Gerdom v. Continental Airlines, Inc.,* 692 F.2d 602, 605–06 (9th Cir. 1982) (en banc).

Kennedy does not question the correctness of these decisions, but contends that they have no application here because he has alleged discrimination based on personal appearance, rather than on sex. Since the gravamen of his submission with respect to hair length is that conduct which is permissible for women is not allowed for men, his grievance sounds more like a complaint of sex discrimination than of personal appearance discrimination. But even if the issue is characterized as whether the regulations discriminate on the basis of personal appearance, Kennedy cannot prevail.

The Human Rights Act, like the Mayor's Order, permits employers to adopt grooming regulations "uniformly applied to a class of employees for a reasonable business purpose." D.C.Code § 1–2502(22). In 1973, when the prohibition against discrimination on the basis of personal appearance was proposed as a part of the identical predecessor to § 1–2502(22), the Hospital Council objected somewhat inelegantly that the statute as drafted "would prohibit the disqualification of a transvestite because it requires that uniforms be unisex." A District of Columbia Council staff memorandum addressed to the members of the Council responded as follows:

> This is an incorrect interpretation. The definition contains an exemption for uniform requirements if they are applied for a 'reasonable business purpose,' which would

include requiring men to dress as men and women as women.

*See* October 11, 1973 Council Memorandum on Proposed Draft Clarification, 34 D.C.R.R. at 7 (1973). The Council enacted the statute as proposed, and there is no reason to believe that it meant to proscribe different grooming standards for men and women. The language of the Mayor's Order is identical in pertinent part to that of the statute, and we should construe it accordingly.[2]

### III.

Kennedy also claims that the Fire Department's hair length regulations have not been "uniformly applied" because some supervisors did not strictly enforce them. As the District points out, however, there is no doubt that the regulations were adopted as a uniform policy, at least for male firefighters. The evidence before the hearing examiner shows only that there were a few instances in which the grooming regulations were not enforced. There are more than 1300 firefighters.

Men and women are finite beings. Perfection is a rare commodity. *See, e.g., Allen v. United States,* 603 A.2d 1219, 1228 (D.C.1992) (en banc). The regulations were intended to be uniformly applied, and where, as here, there is no allegation or finding that the requirements were routinely waived for most men as a matter of course, the regulations cannot be invalidated simply because their enforcement was less than flawless.

### ON PETITION FOR REHEARING

In response to a petition for rehearing, and an opposition thereto from our initial decision in this matter, we take this opportunity to resolve the specific questions raised.[1] Kennedy contends he is entitled to recover both attorneys' fees and compensatory damages under the provisions of Mayor's Order 75–

---

2. I am also satisfied that the Fire Department's hair length regulations pass muster under the requirement of the Mayor's Order that they be uniformly applied "for a reasonable business purpose." *See Marshall v. District Unemployment Compensation Bd.,* 377 A.2d 429, 434–35 & n. 10 (D.C.1977) (sustaining hair length regulation for police officer despite the view of the

Director of the Office of Human Rights that trimmed hair was not a *bona fide* occupational qualification).

1. For our prior decision in this case, *see* [page 851] *Brian R. Kennedy v. District of Columbia,* Nos. 91–CV–1503 & 91–CV–1504 (D.C. Sept. 12, 1994).

230 § 19(b), 1975 D.C.Stat. at 526. Section 19(b) of Mayor's Order 75–230 states, in pertinent part:

> When the Director [of] EEO finds that an employee of a department was discriminated against ... the department shall take remedial actions which shall include one or more of the following, *but need not be limited to these actions:*
>
> (1) Retroactive promotion, with backpay ...
>
> (2) Consideration for promotion ...
>
> (3) Cancellation of an unwarranted personnel action and restoration of the employee ...
>
> (4) Expunction from the department's records of any
>
> reference to or any record of unwarranted disciplinary action ...
>
> (5) Full opportunity to participate in the employee benefit denied him....

Mayor's Order 75–230 § 19(b), 1975 D.C.Stat. at 526–27 (emphasis added). Specifically, Kennedy asserts he is entitled to attorneys' fees and compensatory damages because section 19(b) states that remedial actions "need not be limited" to those enumerated. We find this assertion unpersuasive.

 Under the "American Rule," a prevailing party is not entitled to recover attorneys' fees in the absence of express statutory or contractual authorization. *See, e.g., Schlank v. Williams,* 572 A.2d 101, 108 (D.C.1990); *Key Tronic Corp. v. United States,* — U.S. ——, 114 S.Ct. 1960, 1965, 128 L.Ed.2d 797 (1994); *Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975). "The absence of specific reference to attorney's fees is *not* dispositive *if* the statute otherwise evinces an *intent* to provide for such fees.... Mere 'generalized commands,' however, will *not* suffice to authorize such fees." *Key Tronic, supra,* — U.S. at ——, 114 S.Ct. at 1965 (citation omitted) (emphasis added); *see also Schlank, supra,*

572 A.2d at 108 ("Unless the legislature has made '*specific and explicit provisions* for the allowance of attorneys' fees,' [citation omitted] or there is '*clear support*' in the language or legislative history of a statute for such an intent, [citation omitted] no statutory basis for an award of attorneys' fees exists") (emphasis added). Without statutory or contractual authorization, a prevailing party will be entitled to recover attorneys' fees only if one of the recognized exceptions to the "American Rule" is applicable. *See, e.g., Alyeska, supra,* 421 U.S. at 257–59, 95 S.Ct. at 1621–22.[2]

In *Zenian v. Office of Employee Appeals,* 598 A.2d 1161 (D.C.1991), we held that the term "compensation system" within the context of the Comprehensive Merit Personnel Act (CMPA) should be construed to include attorneys' fees. *Id.* at 1162. In so holding, we gave a broad construction to the City Council's use of the words "need not be limited to." *Id.* at 1164. However, the critical difference between this case and *Zenian* is that in *Zenian* there was explicit statutory authorization for the recovery of attorneys' fees. Although the CMPA did not expressly mention attorneys' fees, the CMPA expressly incorporated by reference the "compensation system ... in effect on December 31, 1979," which included the Federal Back Pay Act (FBPA) and, the FBPA contained an express provision for attorneys' fees. *Id.* at 1165. Thus, attorneys' fees were found to be recoverable because "the FCPA's explicit authorization for such 'make whole' relief ha[d] been effectively incorporated by reference." *Id.* at 1166 n. 10. Because the legislative intent was clear from the overall remedial structure of the CMPA, we concluded in *Zenian* that attorneys' fees were recoverable even though they were not specifically mentioned in the text of the CMPA.

 Neither the language nor the legislative history of Mayor's Order 75–230 offer "clear support" for the recovery of attorneys' fees (nor for the recovery of compensatory damages). Pursuant to § 29.3 of Title 34

---

**2.** These exceptions have traditionally been narrowly construed. *See, e.g., Alyeska, supra,* 421 U.S. at 247, 95 S.Ct. at 1616. None of the recognized exceptions, including the bad faith exception, appear to be even remotely applicable here and Kennedy does not argue to the contrary.

DCRR, Mayor Washington, on October 31, 1975, issued Mayor's Order 75–230.[3] In 1977, the District of Columbia Council reenacted Title 34 DCRR as the D.C. Human Rights Act of 1977, D.C.Code § 1–2501 *et seq.* (1987), without making any substantive changes in its provisions.[4] Title III of the D.C. Human Rights Act is entitled *"Procedures,"* and it is in Title III, at § 313, that the Council authorized the D.C. Commission on Human Rights to award a successful discrimination complainant "compensatory damages" and "reasonable attorney fees." *See* D.C.Code § 1–2553 (1987). Also in Title III, at § 303, the Council directed the Mayor to establish a separate set of *"rules of procedure* for the investigation, conciliation and hearing of complaints filed against District government agencies ... alleging violations of this act." D.C.Code § 1–2543 (1987) (emphasis added). Since the remedial provisions were included under the "Procedures" subdivision of the Act, in directing that the Mayor establish "rules of procedure," the Council was directing the Mayor to establish, *inter alia,* the remedies that would be available to persons who filed complaints of discrimination against the District government.[5]

▆▆▆ In terms of compensatory damages, Kennedy is seeking recovery for his emotional trauma arising from his employer's discriminatory treatment towards him *prior to* the filing of his claim *and* for a ten-year period *thereafter.*[6] Our case law in this area is both sparse and admittedly unsettled. However, one point is crystal clear: if Kennedy was seeking recovery for discriminatory acts engaged in by a private employer (or other private entity), he would be entitled to both compensatory damages and attorneys' fees under the D.C. Human Rights Act. *See* D.C.Code § 1–2553(a)(1) (1987). In this situation, upon an adequate showing of discrimination, Kennedy would be entitled to recover for embarrassment and humiliation, but not necessarily for pain and suffering and emotional distress. *See Doe v. D.C. Comm'n On Human Rights,* 624 A.2d 440, 447–48 (D.C. 1993).[7] As a former D.C. government employee, however, Kennedy is not entitled to compensatory damages or attorneys' fees.

In *Williams v. District of Columbia,* 467 A.2d 140 (D.C.1983), we clearly stated that D.C. government employees, unlike non-government employees, are required to exhaust the administrative remedies available to them under the D.C. Human Rights Act. *Id.* at 142. In *Lamont v. Rogers,* 479 A.2d 1274

3. Section 29.3 is entitled "Complaints against D.C. Agencies," and provides in pertinent part: Notwithstanding any other provision of this Title, the Mayor–Commissioner shall establish *rules of procedure* for the investigation, conciliation and hearing of complaints filed against D.C. Government agencies ... alleging violations of this Title.
34 DCRR § 29.3 (1975) (emphasis added).

4. The sole purpose of reenacting Title 34 as a statute was to give its provisions greater stature and force. Committee on Public Services and Consumer Affairs, Committee Report on Bill 2–179, July 5, 1977, at 1–3.

5. This is the way Mayor Washington interpreted the identical provision, § 29.3, of Title 34 before the Council reenacted it without change in § 303 of the Human Rights Act of 1977—as illustrated by the remedial provisions of Mayor's Order 75–230. And, this is the way Mayor Barry interpreted § 303 when he issued the rules to implement it. *See* "Equal Employment Opportunity Rules Governing Complaints of Discrimination in the District of Columbia Government," 31 DCRR §§ 56, 67, 77–78 (1984).

6. Kennedy retired from his employment with the D.C. Fire Department in 1992 or 1993. Howev-

er, because the Mayor's Order clearly requires the prompt presentment of claims, and because Kennedy failed to file any additional claims against his employer, we are unable to review Kennedy's new claim for compensatory damages arising from alleged discriminatory treatment occurring after his initial claim was filed. *See* Mayor's Order 75–230 §§ 7, 8, 1975 D.C.Stat. Thus, our discussion will focus on Kennedy's original claim for compensatory damages.

7. "Section 213.4 [of the D.C. Commission on Human Rights' current "Guidelines For Payment of Compensatory Damages and Attorney's Fees Under the Human Rights Act of 1977," 31 D.C.Reg. § 213.4, at 6266 (1984)] requires reliable evidence to determine 'the *amount* of damages,' but *not* to determine *if* damages were suffered. Because § 211 provides that humiliation, embarrassment and indignity flow *naturally* from a finding of discrimination...." *Id.* at 447 (emphasis added). However, in order to recover expenses incurred for pain and suffering and emotional distress, the complainant is required to present sufficient evidence linking his present mental condition to the discriminatory act. *Id.* at 448.

(D.C.1984), we indicated that the remedies available to a D.C. government employee under Mayor's Order 75–230 need not be limited to those enumerated in section 19(b). *Id.* at 1277.[8] We have observed, however, that the Human Rights Act places the remedies provisions under the "Procedures" subdivision of the Act. Therefore, in directing the Mayor to establish "rules of procedure" for the resolution of complaints filed against the D.C. government, it is logical to conclude (as both Mayors Washington and Barry have done in the past) that the Council was directing the Mayor to establish, *inter alia*, the remedies available to complainants who successfully pursue Human Rights violations against the District.[9] Moreover, in *Lamont* we never stated which remedies—beyond those enumerated in section 19(b)—(if any) were available under Mayor's Order 75–230.[10]

 Although it is clear from the language of section 19(b) of Mayor's Order 75–230 that the remedies available to a successful complainant are not limited to those enumerated therein, it is not clear enough from the language or legislative history of the Order that the Council intended for the recovery of attorneys' fees and compensatory damages, which are quite different in kind from the types of remedies specified in section 19(b). Therefore, absent explicit statutory language or other clear legislative intent, we must rely upon rules of statutory construction, including the doctrine of *ejusdem generis*. We conclude that we lack the requisite statutory authorization to award attorneys' fees or compensatory damages. As to the latter, compensatory damages are an important form of relief. A right of action is much more valuable when such a remedy is available. Under these circumstances, we deem it improbable that the drafters intended such a remedy to be inferred from language which makes no mention of it, espe-

cially where other remedies of equal or lesser significance are explicitly enumerated.

*So Ordered.*

---

8. Specifically, we stated: "They [respondents] maintain that her [petitioner] available remedies are *limited to* those spelled out in section 19(b) ... which does not mention compensatory damages. *We reject this argument* because section 19(b) also states that remedial actions ... 'need not be limited' to those enumerated. Thus it *may be* that there are more remedies available to petitioner under the Human Rights Law than under Title VII. But she has not sought compen-satory damages.... Absent any claim for further damages, the purported disparity in the available remedies makes no difference ...." *Id.* (emphasis added).

9. *See* text and accompanying notes, *supra*, at 863.

